UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PATRICIA GREY,                              :
            Plaintiff,                      :
                                            :
    v.                                      :      3:00-cv-2033 (JCH)
                                            :
                                            :
CITY OF NORWALK BOARD OF                    :
EDUCATION, VICTOR HERBERT,                  :      FEBRUARY 4, 2004
AND GREG RICCIO,                            :
            Defendants.                     :

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 34]

Plaintiff Patricia Grey asserts claims of unlawful discrimination based on Title VII

(42 U.S.C. § 2000e *et seq.*) the Connecticut Fair Employment Practices Act, Conn. Gen.

Stat. § 46a-60(a)(1) ("CFEPA"), and 42 U.S.C. § 1983, and common law negligent

infliction of emotional distress.  Defendants City of Norwalk Board of Education

("Board"), Superintendent Victor Herbert, and now-former Deputy Superintendent Greg

Riccio (hereinafter referred to as "defendants") move for summary judgment.  For the

following reasons, the motion is granted in part and denied in part.

## I.    BACKGROUND

Plaintiff Patricia Grey, PhD, an African-American female, served as the Norwalk

Public Schools' Director of Curriculum and Assessment from July 1994 until September

1999.  She contends that she suffered in a hostile work environment and was ultimately

constructively discharged from her position with the District because of a series of incidents

1

between July 1998 and her resignation in September 1999.  Grey describes the series of incidents detailed below.[1]

Herbert became the District Superintendent in July 1998.  Soon after, the position of Deputy Superintendent became available.  Grey approached Herbert about the job, but Herbert told her "she should not apply for the position."  Aff. of Patricia Grey, Pl.'s Rule 56(a)(2) Statement, Ex. B, ("Grey Affidavit") at ¶ 5 [Dkt. No. 39].  Herbert placed her on probation for not meeting her job responsibilities.  Id. at ¶ 22.  Caucasians with fewer responsibilities, which were not being met, were not put in any type of a probationary process.  Id.

Herbert hired Riccio during the fall of 1998.  Shortly after Riccio took over the Deputy Superintendent position, he approached Dr. Grey and told her that she should "look out for yourself" and start trying to find a Superintendent position at another school district or with a private corporation.  Id. at ¶ 13.  In January 1999, Riccio told Grey that her position was being eliminated at the end of the 1998-99 school year.  Id. at ¶ 28.

On or about January 25, 1999, Grey learned that Herbert had asked his secretary to type a letter notifying Grey that she was being terminated.  When Grey confronted Herbert, he denied the charge.  Id. at ¶ 30.

Grey claims that the administration also gave her the responsibilities of three

---

[1]On this motion for summary judgment, the court views the evidence in the light most favorable to the plaintiff.

supervisors who were eliminated or had assignments removed from them, but did not give her extra secretarial support even though two of those supervisors had worked with full-time secretaries. Id. at 1; Grey Aff. at ¶ 2.

In a meeting on January 26, 1999, Herbert eliminated all of Grey's responsibilities except oversight for elementary education. Id. at ¶ 20. Herbert said that "perhaps [Grey] could do that one thing well." Aff. at ¶ 21. He said in a January 27, 1999 memo that he did this in response to her concerns that she had too much to do. 1/27/99 Memo from Herbert to Grey, Pl.'s Rule 56(a)(2) Statement, Ex. D [Dkt. No. 39]. Grey responded on January 29, asserting that she "never complained about and never asked to be relieved of any of my 16 responsibilities or other initiatives, projects, and partnership. Although I have said that I have a lot to do and need sufficient staff support to accomplish everything to the degree the district expects." 1/29/99 Memo. from Grey to Herbert, Pl.'s Rule 56(a)(2) Statement, Ex. A at 2 [Dkt. No. 39].

In March, Riccio interrupted a meeting of district principals chaired by Grey and demanded to discuss an item not on the agenda. Grey saw this as a usurpation of her authority in front of her subordinates. Id. at ¶ 31. These actions never occurred with white male administrators in the district. Id. at ¶ 31.

During the time from January to June 1999, Herbert also sent Grey petty reprimands that were not sent to white male employees. Id. at ¶ 34. Grey received a positive evaluation in June 1999, with a few noted areas for improvement. Riccio, "Cabinet

Self-Evaluation," Defs' Local Rule 9(c)(1) Statement [Dkt. No. 36], Ex. E.

Many people, including Board of Education President Rosa Murray, advised Grey to contact an attorney, suspecting that she was the victim of racial discrimination. When a special Board meeting was scheduled in June 1999, about 50 community members fearing termination of Grey appeared at the meeting to support her. Herbert cancelled the meeting. Grey Aff. at ¶ 35.

Grey further alleges that she was the only one of her colleagues not allowed to "cross-train secretaries" for different responsibilities and that she was not compensated for extra technology-related responsibilities, though a white, male colleague was. Id. at ¶ 11.

Herbert informed Grey on July 15, 1999, that he wanted to buy out her contract. Id. at ¶ 42. Herbert said to consider herself "finished" and not to come to work. Grey insisted on remaining at work until a separation agreement was reached. Id. at ¶ 42, 46.

Herbert suggested on July 28, 1999, that she prepare a letter of resignation and outline proposed separation terms for the Board. Id. at ¶ 44. Grey refused to prepare the letter, id., but did compose a memo setting forth proposed separation terms. Defs.' Local Rule 9(c)(1) Statement, Ex. K [Dkt. No. 36].

The Board refused to accept a separation proposal at its August 31, 1999 meeting, in which the Board met with Herbert while Grey remained outside. Grey Aff. at ¶ 45. Afterwards, Board President Murray told Grey that the Superintendent had told the Board that Grey had approached him and proposed the buyback, and had also not shared his

4

memos of July 15 and July 28 with the Board. Id. at ¶ 45.

In September, Grey contends that the aggregation of these events pushed her to the point of being physically and emotionally unable to return to work at Norwalk. She provided the Board with notice on September 16, 1999. Id. at ¶ 46.

Grey filed an EEOC claim on March 8, 2000, alleging discrimination based on race, color, sex, and age. Pl.'s Mem. and Rule 56(a)(2) Statement, Ex. M [Dkt. No. 39]. She also filed claims with the CHRO. Id. at 15; Defs.' Local Rule 9(c)(1) Statement, Ex. N [Dkt. No. 36].

Grey filed this action on October 20, 2000, alleging race, national origin, sex, and age discrimination in violation of Title VII; race, national origin, sex, and age discrimination in violation of the Connecticut Fair Employment Practices Act; violation of her fourteenth amendment right to equal protection of the laws, brought under 42 U.S.C. § 1983; and negligent infliction of emotional distress.

## II.    DISCUSSION

### A.    Standard

The role of the court on summary judgment is "not to try issues of fact, but only to determine whether there are issues of fact to be tried." Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995). In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v.

5

Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002).  Once the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256, and present such evidence that would allow a jury to find in his favor.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255.  "Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  Lucente v. Int'l Bus. Mach. Corp., 310 F.3d 243, 253 (2d Cir. 2002).

The plaintiffs, however, cannot escape summary judgment merely by asserting that unspecified disputed material facts exist or through conjecture or speculation.  Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).  If little or no evidence supports the non-moving party's case, there is no genuine issue of material fact and summary judgment may be appropriate.  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994).  Disputed facts that are not material to the issues in the case may not defeat summary judgment.  Hemphill v. Schott, 141 F.3d 412, 416 (2d Cir.1998).  See also Anderson, 477 U.S. at 247-48 (the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact").

### B.    Title VII Claims

Grey claims that the defendants discriminated against her based on her race, sex, age, and national origin, in violation of Title VII. The defendants argue that (1) age discrimination is not cognizable under Title VII; (2) that the actions complained of do not support an inference of constructive discharge; (3) that the harassment alleged by Grey is insufficient to support a hostile work environment claim; and (4) that Grey did not exhaust her national origin claim.

Under Title VII, a claim for employment discrimination is governed by the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). This analysis requires the plaintiff to first establish a prima facie case of discrimination. To do so, the plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she experienced an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (citing McDonnell Douglas, 411 U.S. at 802). This prima facie case creates a presumption that the employer unlawfully discriminated against the plaintiff, and the burden then shifts to the employer to "articulate a legitimate, clear, specific and nondiscriminatory reason" for its actions. Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995); see also Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). If the employer does so, the plaintiff then has the burden to establish by a preponderance of the evidence that the employer's stated reason

7

was merely a pretext for discrimination. <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 143 (2000).

### 1.     Proper Title VII Parties (Individual Defendants)

As an initial matter, the court notes that a Title VII claim cannot be brought against individual supervisory employees, but only against the employer itself. <u>See, e.g.</u>, <u>Looby v. City of Hartford</u>, 152 F. Supp. 2d 181, 184 (D. Conn. 2001) (citing <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1314-17 (2d Cir. 1995), abrogated on other grounds, <u>Burlington Indus. v. Ellerth</u>, 524 U.S. 742 (1998)). As a result, summary judgment is granted on the Title VII claims against Herbert and Riccio.

### 2.     Age Discrimination/Title VII (Board)

Next, the court agrees with the defendants that age discrimination is not within the scope of Title VII. That statute makes it "an unlawful employment practice" for an employer to "discharge or otherwise discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 4000e-2(a)(1). <u>See also</u> Barbara Lindemann and Paul Grossman, Employment Discrimination Law 5 (3rd ed. 1996). The Age Discrimination in Employment Act, 29 U.S.C. § 621-34 ("ADEA"), prohibits age discrimination, but Grey does not reference the ADEA in her complaint or papers. Thus, summary judgment is granted on Grey's Title VII age discrimination claim.

8

### 3.     National Origin Discrimination/Title VII (Board)

#### a.     Exhaustion

The Board argues that Grey's claim of discrimination on the basis of national origin is barred because she failed to raise it before the EEOC. A plaintiff must raise claims of discrimination at the applicable administrative agency before pursuing those claims in federal court. A claim is exhausted if it was actually raised or is "reasonably related" to a claim raised. Butts v. City of New York Dep't of Housing Preserv. and Dev., 990 F.2d 1397, 1402 (2d Cir. 1992), superseded on other grounds by statute as stated in Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir. 1998).

The Second Circuit has recognized three situations in which a claim is "reasonably related." First, a non-exhausted claim is "reasonably related" when its omission is essentially due to "loose pleading," and when the claim is within the scope of the investigation which would reasonably be expected to grow out of the agency claim. Butts, 990 F.2d at 1402. The second type of allowed, related claim is one alleging retaliation for filing a claim before the agency itself. Id. The third is where the unexhausted claim is a post-agency incident of discrimination carried out in precisely the same manner as the action complained of to the agency. Id.

Because Grey's unexhausted national origin claim arises out of the same incidents as those alleged, suggesting a different basis for those same events, only the first type of

"related" claim could be at issue here. Grey raised discrimination on the basis of sex, race, age, and color with the EEOC. Pl.'s Mem. and Rule 56(a)(2) Statement, Ex. M [Dkt No. 39]. In her complaint in this action, Grey states that she is "of African descent" and that the defendants also discriminated against her on that ground.

While "race" and "color" are somewhat related to "national origin," they are distinct bases for discrimination. While the investigation into her claim would have encompassed the way she was treated versus non-black employees, male employees, or younger employees, a national origin claim would in theory entail an investigation into how other employees of non-African descent were treated.

The content of Grey's Title VII allegations in the complaint, however, seems to treat discrimination against her because of her national origin as identical to discrimination against her because of her race. See Compl. at ¶ 38 ("The City of Norwalk Board of Education treated the Plaintiff differently than other similarly situated white male administrators and younger administrators"). Fact-wise, this would make the claims related. See Forbes v. State Univ. Of New York at Stony Brook, 259 F. Supp. 2d 227, 233-34 (E.D.N.Y. 2003) (plaintiff's ethnicity claim was reasonably related to her EEOC allegations of race, color, and sex discrimination because they were "essentially the same claim"). For purposes of this motion, the court concludes there was exhaustion of the national origin claim.

10

###### b.    Prima Facie Case

However, Grey does not present any evidence to support a prima facie case of national origin discrimination.  All Grey alleges is that she is of "African descent"; she then presents evidence that she was discriminated against because of her race.  <u>See, e.g.</u>, Grey Aff. at ¶ 10, 11, 22, 31, 34 ("caucasian male," "white male").  Even if the court assumes that her statement that she is "African-American," <u>id.</u> at ¶ 22, establishes her membership in a protected "national origin" class, and even if it does set forth a prima facie case of race discrimination, it does not set forth circumstances giving rise to an inference of discrimination on the basis of "national origin."  Without any evidence to support that basis, summary judgment on the plaintiff's Title VII national origin claim is granted.

###### 4.    Constructive Discharge/Title VII (Board)

The defendants also argue that the actions of which Grey complains did not rise to the level of intolerability necessary to establish constructive discharge.  The court disagrees and denies summary judgment on this claim.

To present a prima facie case of discriminatory discharge action under Title VII, Grey must show that she was either actually or constructively discharged, and that "the discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in a protected class." <u>Terry v. Ashcroft</u>, 336 F.3d 128, 152 (2d

Cir. 2003).[2]

### a.    Constructive Discharge Showing

Constructive discharge occurs when an employer "intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." Id. at 151-152 (citing Kirsch v. Fleet St., Ltd., 148 F.3d 149, 161 (2d Cir.1998), Chertkova v. Conn. Gen. Life Ins. Co., 92 F. 3d 81, 89 (2d Cir. 1996)). "The effect of adverse conditions is cumulative." Id. at 90.

Grey presents a variety of circumstances that, combined, she argues made her situation "intolerable," including: the repeated threat that her position would be eliminated; a rumored letter announcing her termination; Riccio's public usurpation of her authority in front of her subordinates; the administration's manipulation of her curricular responsibilities; petty reprimands; and Herbert's suggestion that the District buyback her contract and his subsequent comment that she should consider herself "finished." Together, these circumstances support a reasonable inference of constructive discharge. On Grey's version of the facts, the fact-finder could determine that it was reasonable for her to assume that she was "compelled to leave." Id.

Moreover, threats of termination alone are sometimes sufficient to show constructive discharge. See Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987). Here,

---

[2]Proof of such a causal connection can be established through "evidence such as disparate treatment of fellow employees who engaged in similar conduct." Terry, 336 F.3d at 152.

Riccio told Grey to "watch out for herself," and warned her that her job would be eliminated at the end of the year. This also supports an inference of constructive discharge, especially when combined with the other actions that Grey alleges. See Chertkova, 92 F.3d at 90 (supervisor's comment to plaintiff that she would not "be around" supported finding of constructive discharge); Terry, 336 F.3d at 153 (supervisor's comments to plaintiff that "your days are numbered" and that his "life's over with" and "you're going to be brought up on more charges" would allow a reasonable person to infer that he was not wanted as an employee and that he was going to be forced out).[3]

Grey's version of the facts, if believed, would also establish that the Board deliberately sought to compel her to leave her position. See Stetson v. Nynex Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993). For instance, Grey alleges that Herbert approached her about a contract buyback, then lied to the Board when he presented her proposal, representing instead that she had initiated the buyback. This occurred after she had been told several times that her position would be eliminated and warned to watch out for herself.

---

[3]The defendants argue that Grey's contentions are belied by language in letters from Herbert to Grey and by the fact that he signed her contract for the 1999-2000 school year. Those differences create an issue of material fact, however, and go to the weight of the evidence, not its sufficiency. See Kirsch, 148 F.3d at 162.

13

### b.    Inference of Discrimination

1. <u>Race</u>.  Grey presents a variety of facts to support her racial discrimination claim. She alleges, and attests in her affidavit, that Riccio usurped her authority at a meeting with her subordinates, and that she discussed the issue of racial discrimination with him then. She further contends that the Board of Education treated her differently than other similarly situated white male administrators.  She alleges that during the period January through June 1999, she received support from Board of Education members and employees, who expressed their belief that Dr. Grey was the victim of discrimination and advised her to contact and attorney, including Board of Education President Rosa Murray.  Grey further draws the court's attention to a September 2000 CHRO decision finding the City of Norwalk Board of Education liable for race, color, and age discrimination in its decision to deny a Norwalk teacher, John Saunders, promotion to assistant principal in 1997.  Pl.'s Rule 56(a)(2) Statement, Ex. K [Dkt. No. 39].  Grey also claims that she was not given extra compensation for her technology-related duties, though a white, male colleague was. Grey Aff. at ¶ 11.  Finally, Grey's affidavit recounts numerous conversations with Norwalk officials, acknowledging the discrimination that she was suffering, including one Board Member, Rick Fuller, who commented that "he predicted that all minorities would be eliminated from the Central Office by Victor Herbert." <u>Id.</u> at ¶ 39.

"[D]irect evidence of discrimination is not necessary." <u>Lizardo v. Denny's, Inc.</u>, 270 F.3d 94, 104 (2d Cir. 2001) (citing <u>Norton v. Sam's Club</u>, 145 F.3d 114, 119 (2d

14

Cir.1998)). "If there is sufficient circumstantial evidence on which to build a case, it is for the jury to determine what inferences can be drawn from that evidence." Id. Indeed, circumstantial evidence is common in discrimination suits, because "[a]n employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent." Norton, 145 F.3d at 119 (quoting Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir.1991)). Grey has thus presented evidence that satisfies her prima facie burden. The Board does not appear to offer an alternative, legitimate reason to explain the events she describes; as a result, especially given the fact-intensive inquiry that questions of employer intent involve, Grey has presented ample evidence to proceed to trial on her Title VII race discrimination constructive discharge claim.

2. Sex. Grey's sex discrimination claim presents more difficulty. As with race discrimination, the initial burden in a sex discrimination claim is on the plaintiff to establish a prima facie case of discrimination. Weinstock, 224 F.3d at 42.

Grey has not come forward with evidence to support a prima facie case of sex discrimination. She repeatedly alleges that "white males" were treated differently and points out that a white male colleague was compensated for his technology responsibilities while she was not. She gives no additional evidence to support her case and provides no comments based on sex. "[A] plaintiff must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive."

15

See <u>Bennett v. Watson Wyatt & Co.</u>, 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001). The evidence that Grey presents regarding one male colleague, who is white, without further information regarding those circumstances or any other evidence regarding sex discrimination, is insufficient for a jury to draw the inference of sex discrimination. Thus she has not met even the "de minimus" burden required of her at this stage. See <u>Cronin v. Aetna Life Ins. Co.</u>, 46 F.3d 196, 203-04 (2d Cir. 1995).

### c.    Board's Liability

As the discussion above suggests, there is also a sufficient basis for holding the Board liable under Title VII for the discrimination, though the defendants have not raised this issue. Under Title VII, an "employer" is defined as "a person engaged in an industry affecting commerce . . ., and any agent of such person." 42 U.S.C. § 2000e(b) (emphasis added); see also <u>Levendos v. Stern Entm't, Inc.</u>, 909 F.2d 747, 751 (3rd Cir. 1990) (the action of supervisors is imputed to the employing entity through agency principles). "The term 'agent' is not defined by Title VII, but has been interpreted by courts as an individual who serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment." <u>Pierce v. Commonwealth Life Ins. Co.</u>, 40 F.3d 796, 803 (6th Cir. 1994) (internal citations omitted).

Here, Grey alleges discriminatory conduct by the District's top officials, the Superintendent and Deputy Superintendent. She further alleges that Board members, including the Board President, told her that they thought she was a victim of discrimination

and that she should get a lawyer, and that they were aware that Herbert had lied to them about the circumstances of the buyback. By Grey's facts, then, the Board was explicitly aware of the discrimination and allowed it to continue, then ratified her constructive discharge. See also infra at 27-28 (discussing Board's liability under § 1983).

For all these reasons, summary judgment on Grey's Title VII constructive discharge claim against the Board is denied with regard to race discrimination; granted with regard to sex, age, and national origin discrimination.

### 4.     Title VII Hostile Work Environment Claim (Board)

The Board also seeks summary judgment on Grey's hostile work environment claim. "A hostile work environment claim requires a showing [1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." Alfano v. Costello, 294 F.3d 365, 373 (2d. Cir. 2002).

### a.     Hostile Work Environment Showing

Demonstrating that conduct was sufficiently severe to alter the terms of the plaintiff's employment has "objective and subjective elements: the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." Terry, 336 F.3d at

17

128 (internal quotations omitted).  The court must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

As with constructive discharge, the court examines the totality of the circumstances. Id. (quoting Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 437 (2d Cir. 1999)).  While this is a case-by-case analysis, "a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Alfano, 294 F.3d at 373 (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000))(internal quotation marks omitted). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris, 510 U.S. at 21(internal quotations omitted).

The Second Circuit recently clarified the showing necessary for establishing a hostile work environment claim in Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003).  The Circuit cautioned, "While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of

such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*." Id. at 148 (quoting Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000))(internal quotation marks omitted)(emphasis in original).

Grey alleges that her supervisors harassed her in several ways that altered her job for the worse. She claims, among other things, that Herbert and Riccio manipulated her responsibilities, undermined her in front of her subordinates, sent her petty reprimands, and did not allow her the customary secretarial support for her duties, trying to set her up to fail. While this type of harassment may be different than, for instance, that alleged in Richardson, 180 F.3d at 438-40, where the plaintiff claimed, among other things, that co-workers had put hair in her food and shot rubberbands at her, it nonetheless created circumstances in which the conditions of Grey's employment were altered for the worse. See Terry, 336 F.3d at 148.

Grey's claims also differ from many hostile work environment claims because she does not allege any explicitly racial or sexist remarks as part of her evidence. Instead, she Grey merely alleges that she was treated differently from white, male supervisors. Though hostile environment claims often involve racial or sexual remarks, see, e.g., Richardson, 180 F.3d at 434, the alleged harassment need not be explicitly sexual or racial, though a basis must exist for inferring that the conduct occurred because of the defendant's membership in the protected class. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 n.6 (3d Cir.

19

1990); <u>Ricks v. Conde Nast Publ'n, Inc.</u>, 92 F. Supp. 2d 338, 349 (S.D.N.Y. 2000), <u>aff'd</u>,

6 Fed. Appx. 74 (2d Cir. 2001). The Supreme Court has explicitly held that these

inferences can be established by direct comparative evidence. <u>Oncale v. Sundowner</u>

<u>Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998) ("A same-sex harassment plaintiff may also,

of course, offer direct comparative evidence about how the alleged harasser treated members

of both sexes in a mixed-sex workplace, [but] . . . must always prove that the conduct at

issue . . . actually constituted "discrimina[tion] . . . because of . . . sex."); <u>see also</u> <u>Ricks</u>, 92

F. Supp. 2d at 349 (it is an "open question" whether plaintiff's sole proof of intent that she

was treated differently from the non-African-American account managers was sufficient to

support hostile work environment claim).

### b.    Inference of Discrimination

1. <u>Sex</u>. As discussed above, Grey's bare allegation that she was treated differently

from males and her identification of one white male whom she alleges was compensated for

technology responsibilities while she was not is insufficient support for her case to go to the

jury on sex discrimination. <u>See</u> <u>supra</u>, 15-16. She provides no additional evidence to

support her case, provides no comments based on sex, and does not even identify the other

similarly situated "males" who were treated differently. As a result, she has not created an

issue of fact on this claim.

2. <u>Race</u>. Also as discussed above, Grey does present sufficient support for her case

that the workplace hardships she endured were because of her race. <u>See</u> <u>supra</u>, 14-15. The

court recognizes that questions of employer intent, like those in this case, involve "an assessment of individuals' motivations and state of mind," <u>Brown v. Henderson</u>, 257 F.3d 246, 252 (2d Cir. 2001), an assessment better left to the trier of fact than to the court on summary judgment. Moreover, Grey presents evidence that others commented on the discrimination, and attributed mistreatment of her to her race. <u>See, e.g.</u>, Grey Aff. at ¶¶ 38-41.

As a result, the defendants' motion for summary judgment on Grey's Title VII hostile work environment claim against the Board is denied as to race discrimination, and granted as to sex, age, and national origin discrimination.[4]

## C.   Connecticut Fair Employment Practices Act

### 1.   Individual Claims

As with Title VII, Grey cannot assert claims against individual supervisors under CFEPA. <u>See</u> <u>Perodeau v. City of Hartford</u>, 259 Conn. 729 (2002). As a result, Grey's individual CFEPA claims against Herbert and Riccio are dismissed.

---

[4]The actions of Riccio and Herbert are also attributable to the Board, though the defendants have not raised this issue with regards to Grey's Title VII hostile work environment claim. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." <u>Burlington Indus., Inc., v. Ellerth</u>, 524 U.S. 742, 745 (1998); <u>Mack v. Otis Elevator Co.</u>, 326 F.3d 116, 127-28 (2d Cir. 2003). Where there is no tangible employment action, the employer may impose certain affirmative defenses, including that the employer exercised reasonable care to prevent and promptly correct the behavior. <u>See id.</u> at 127. Here, Grey alleges among other things that the Board President advised her that she was being discriminated against and should get a lawyer, yet the Board took no action to remedy the situation.

### 2.    Claims Against the Board

The defendants argue that summary judgment should also be granted on Grey's

CFEPA claims against the Board. They content that, as with Grey's Title VII claims, she

has failed to show constructive discharge, and has also "failed to establish that she suffered

from discriminatory harassment sufficient to alter the conditions of her workplace." Defs.'

Mem. In Supp. Of Summ. J. at 2.

The court looks to federal employment anti-discrimination law for guidance in

enforcing Connecticut's anti-discrimination statute. See Brittell v. Dept. of Corr., 247

Conn. 148 (1998)(relying on Second Circuit's opinion in Chertkova); Levy v. Comm'n on

Human Rights and Opportunities,35 Conn.App. 474 (1994). As discussed above, Grey

has presented sufficient evidence from which a reasonable trier of fact could infer that she

was constructively discharged. See supra 12-13. Summary judgment on Grey's

constructive discharge race discrimination claim against the Board is thus denied.

Grey has also, for the reasons discussed above in relation to her Title VII claims,

produce sufficient evidence to proceed to trial on her race discrimination hostile work

environment claim. Thus the defendants' motion for summary judgment on that CFEPA

hostile work environment race discrimination claim is also denied.

Grey has not presented sufficient evidence to create a prima facie case on her sex

discrimination claim. As discussed above in relation to Title VII, Grey must come forward

with sufficient evidence to support a jury's reasonable inference that she was discriminated against because of her sex. She has not done so. See supra at 15-16. The court thus grants summary judgment on Grey's CFEPA sex discrimination claim.

Unlike under Title VII, age discrimination is actionable under CFEPA. See Conn. Gen. Stat. § 46a-59. However, the plaintiff has presented absolutely no evidence on that claim: no evidence from which a jury could infer that any action of the defendants was based even in part on age, and only one repeated bare allegation that younger employees were treated differently. Compl. at ¶ 38. As a result, summary judgment on Grey's CFEPA age discrimination claims is granted.

Finally, for the reasons discussed above in relation to Title VII, Grey has not made the required prima facie showing as to national origin discrimination. See supra at 10-11. (discussing national origin showing required by Title VII to state a prima facie case). Summary judgment is granted on that claim.

## D.    Section 1983 Claims

The defendants also move for summary judgment on Grey's § 1983 claims in Count 3 of the Complaint, arguing that she has failed to allege that the defendants intentionally sought to discriminate against the class of plaintiffs of which she is a part. The defendants further argue that, in any case, Grey has not demonstrated that the Board was involved in the discrimination such as to be held liable under § 1983, and that Herbert and Riccio are

entitled to qualified immunity.

### 1.     Pleading Requirements

The defendants claim that Grey has not properly pled her § 1983 equal protection violation claim, and that as a result it must fail. This argument is without merit.

A plaintiff may plead concurrent violations of Title VII and § 1983 (or, indeed, only § 1983 claims) against a municipal government body as long as the constitutional claims allege the violation of a constitutional right. See Annis v. County of Westchester, 36 F.3d 251, 255 (2d Cir. 1998); Gierlinger v. New York State Police, 15 F.3d 32, 34 (2d Cir. 1994). There is a long-recognized constitutional right to be free from sex discrimination in public employment. See Annis, 36 F.3d at 254 (citing Davis v. Passman, 442 U.S. 228 (1979)). Similarly, Grey also has a constitutional right to be free from discrimination based on her race or national origin. See, e.g., Hazelwood School Dist. v. United States, 433 U.S. 299, 316 n. 3 (1977).

The defendants argue that Grey has failed to allege an "intent to disadvantage all members of a class that includes plaintiff," as required to state an equal protection claim. Weixel v. Board of Educ. of City of New York, 287 F.3d 138, 151 (2d Cir. 2002). However, the plaintiff in Weixel did not allege that the school had discriminated against her because of an intent to disadvantage a class of which she was a member, or allege anything else that would state an equal protection claim. Instead, the complaint, as described by the

district court, alleged only that the "[d]efendant . . . failed to afford [the plaintiff child] 'equal treatment under the law as other children were evaluated academically before deciding on class placement.'" Weixel v. Board of Educ. of City of New York, 2000 WL 1100395 at * 7 (S.D.N.Y. August 7, 2000). The district court concluded that the equal protection claim had to be dismissed because, among other things, the plaintiff did not "allege that the school discriminated against a particular class of students when it failed to test [plaintiff] or place [plaintiff] in her eighth grade class." Id. The Second Circuit affirmed this portion of the opinion. Weixel, 287 F.3d at 151.

Here, however, Grey does allege an intent to disadvantage the groups of which she is a member. She alleges at the beginning of her complaint that she was "discharged after several months of race, sex, age and national origin discrimination," Compl. at ¶ 1, and in her support of her equal protection claim, alleges that the "three Defendants discriminated against Plaintiff on the basis of her race, national origin, and sex by harassing her and ultimately causing her constructive discharge from the school district in September 1999." Compl. at ¶ 49. This and the rest of Grey's § 1983 pleading is sufficient.

### 2.    § 1983 Race Discrimination Claim

Grey claims that the defendants discriminated against her because of her race, in violation of the fourteenth amendment to the Constitution. "A state and its instrumentalities may not deny 'any person within its jurisdiction the equal protection of the laws.'" Sound Aircraft Servs., Inc. v. Town of East Hampton, 192 F.3d 329, 335 (2d Cir.

1999)(quoting U.S. Const. Amend. XIV). "At its core, equal protection prohibits the government from treating similarly situated persons differently." Id.

Employment discrimination claims brought under § 1983 are analyzed according to the same standards as used to evaluate Title VII claims. See Jessamy v. City of New Rochelle, New York, 292 F. Supp. 2d 498, 511 n.15 (S.D.N.Y. 2003)(citing Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000); Sorlucco v. N.Y. City Police Dep't, 888 F.2d 4, 7 (2d Cir. 1989)). This analysis requires the plaintiff to first establish a prima facie case of discrimination. See, e.g., Weinstock, 224 F.3d at 42.

As the court concluded with regard to the Title VII claims, Grey presents sufficient facts in support of her racial discrimination claim to state a prima facie case. See supra at 14-15. Grey has thus presented ample evidence to proceed to trial on her equal protection claim of race-based discrimination.

#### a.    § 1983/Race (Board)

The Board may not be held liable under § 1983 for the actions of individuals solely on a theory or respondeat superior. Jeffes v. Barnes, 208 F.3d 49, 56-57 (2d Cir. 2000) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). The Second Circuit has found that a municipality may be held liable under § 1983 when the injury was inflicted by its "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Jeffes, 208 F.3d at 57. Additionally, a supervisor's acquiescence to the actions of

his subordinates may amount to a policy or custom, if the subordinate's "discriminatory practice [is] so manifest as to imply the constructive acquiescence of senior policy-making officials." Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 137 (2d Cir. 1999) (citing Sorlucco v. New York City Police Dep't, 971 F.2d 864, 870 (2d Cir. 1992).   When a subordinate's decision is subject to review by the municipality's authorized policy makers, "their ratification would be chargeable to the municipality because their decision is final." City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).  Grey may thus hold the Board liable under § 1983 for discriminatory treatment by Herbert and Riccio, if she can demonstrate that the Board "knew of and ratified the discrimination." Looby, 152 F. Supp. 2d at 187 (citing Monell, 436 U.S. at 690-91).

Here, Grey alleges that Board members advised her to get a lawyer because she was a victim of racial discrimination, and that one member commented that "he predicted that all minorities would be eliminated from the Central Office by Victor Herbert." Grey Aff. at ¶ 39.  The Board failed to act to remedy the discrimination, and eventually ratified what Grey claims was her constructive discharge.  These facts, if proven to the jury, are a sufficient basis to find the Board liable for Herbert's and Riccio's conduct under § 1983.

> **b.    Qualified Immunity/§ 1983/Race (Riccio and Herbert)**

Finally, the defendants argue that Riccio and Herbert are entitled to qualified

immunity on Grey's § 1983 race discrimination claim.[5]  A government official sued in his

individual capacity is entitled to qualified immunity for a constitutional violation if,

considering the record as construed in the plaintiff's favor, the constitutional right in

question was not "clearly established" at the time of the conduct, or if the official's action

was objectively reasonable. See Saucier, 533 U.S. at 201; X-Men Sec., Inc. v. Pataki, 196

F.3d 56, 65-66 (2d Cir. 1999).  The question is "what a reasonable person in the

defendant's position should know about the constitutionality of the conduct." McCullough

v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 278 (2d Cir. 1999)(citation omitted).

Grey's right to be free from discrimination because of her race was well-established

at the time of the events that gave rise to this suit.  See, e.g., Hazelwood Sch. Dist. v.

United States, 433 U.S. 299, 316 n. 3 (1977) (fourteenth amendment forbids racial

discrimination even before enactment of Title VII).  Nor would a "reasonable" official,

especially in light of the long-established and well-known law on the subject, have thought

that it was acceptable to treat Grey differently because of her race.  Looby, 152 F. Supp. 2d

at 189.  Rather, the essence of what the defendants raise is a dispute of fact about whether

Grey was in fact treated differently.  This is properly left to the jury.

**3.    § 1983 Sex and National Origin Discrimination (All Defendants)**

As discussed above, the plaintiff has not put forward sufficient evidence to support a

---

[5]The court only considers qualified immunity on the race discrimination claim because it is the only remaining § 1983 discrimination claim.

prima facie case of sex discrimination or national origin discrimination.  See supra at 9-11,
15-16.  Summary judgment is thus granted on Grey's § 1983 national origin and sex
discrimination claims.

### E.     Negligent Infliction of Emotional Distress (All Defendants)

The defendants also move for summary judgment on Grey's negligent infliction of
emotional distress claim in Count Four of the Complaint, arguing that the Connecticut
Supreme Court's decision in Perodeau v. City of Hartford, 259 Conn. 729, 764-773
(2002), bars claims for negligent infliction of emotional distress arising out of conduct
occurring in the context of a continuing employment relationship, as opposed to conduct
that occurs in the process of a termination of employment.

The defendants argue that Grey's Count Four allegations do not reference her claim
of constructive discharge.  However, paragraph fifty-four, the first paragraph in Count
Four, incorporates "the allegations contained in paragraphs 1 through 53 of the Complaint
as though restated herein word for word," thus incorporating Grey's constructive discharge
claim into Count Four.  The question presented, then, is whether constructive discharge
qualifies as termination of employment for purposes of a negligent infliction of emotional
distress claim.

The application of constructive discharge to a claim of negligent infliction of
emotional distress presents a novel issue in light of Perodeau.  By limiting the scope of the

negligent infliction of emotional distress tort to conduct occurring in the process of termination, the <u>Perodeau</u> court aimed to limit the reach of the tort. <u>Perodeau</u>, 259 Conn. at 756 ("[t]he problem for the law is to limit the legal consequences of wrongs to a controllable degree"). The court explained that its combination of the termination requirement with its prior decisions to allow a negligent infliction of emotional distress claim made sense because, "[i]mplicit in this conclusion is a recognition that emotional distress that might result in illness or bodily harm is a foreseeable consequence of particularly egregious conduct involving a termination, which would, in turn, give rise to a duty to avoid such conduct." <u>Id</u>. at 755. The court further acknowledged that "individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace." <u>Id.</u> at 757. The court noted that making such distress actionable in the context of continuing employment would have several negative consequences:

> [E]mployees who fear lawsuits by fellow employees may be less competitive with each other, may promote the interests of their employer less vigorously, may refrain from reporting the improper or even illegal conduct of fellow employees, may be less frank in performance evaluations, and may make employment decisions such as demotions, promotions and transfers on the basis of fear of suit rather than business needs and desires. All of this conduct would contribute to a less vigorous and less productive workplace.

<u>Id.</u> at 758.

Allowing an employee alleging constructive discharge to assert a negligent infliction

of emotional distress claim does not implicate these concerns. In a constructive discharge case such as the one alleged by Grey, the employment relationship is already terminated, allegedly involuntarily. As a result, the effect of allowing the claim is no different than if the plaintiff had been actually discharged: there is none of the additional "chilling," or "fear" that motivated the Connecticut Supreme Court to preclude the tort from being asserted in ongoing employment relationships. Moreover, in Connecticut, a "constructive discharge is effectively the legal equivalent of a discharge." Kilduff v. Cosential, Inc., 289 F. Supp. 2d 12, 18 (D. Conn. 2003)(quoting Seery v. Yale-New Haven Hosp., 554 A.2d 757 (Conn. App. 1989)). Thus allowing a constructive discharge to form the basis of a negligent infliction of emotional distress claim is consistent with Connecticut constructive discharge law. Accord Gupta v. City of Norwalk, 221 F. Supp. 2d 282, 295 n.6 (D. Conn. 2002)(Thompson, J.)(noting without deciding that a constructive discharge claim would support a negligent infliction of emotional distress claim).

However, the alleged conduct is not sufficiently unreasonable or wrongful to support the negligent infliction of emotional distress claim. Indeed, wrongful motivation is not enough to sustain the claim: "[t]he mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." Parsons v. United Technologies Corp., 243 Conn. 66, 88-89. Instead, "negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process." Id. at 88 (internal quotation marks omitted);

31

Perodeau, 259 Conn. at 750.

Here, Grey alleges that Herbert lied to the Board about Grey's buyback, telling them that it had been her proposal; that he had his secretary type her termination letter and then denied its existence; that Herbert told her she was "finished" and not to report to work, even though the buyback was not yet approved and completed. Moreover, Grey claims that these and other actions were based on her race. The allegations against Riccio involve warnings that her job would be eliminated, an accusation that he usurped her authority in front of her subordinates, and that he manipulated her curricular responsibilities and the associated funds so as to impede her job. The Board allegedly knew of the wrongfulness of their actions and ratified them. These activities, while wrongful, are not "sufficiently wrongful that the defendant should have realized that its conduct involved an unreasonable risk of emotional distress." Perodeau, 259 Conn. at 571; see also Morris v. Hartford Courant Co., 200 Conn. 676, 680 (Conn. 1986)(false accusations were not outrageous where plaintiff did not allege that employer knew they were false or made the accusations with reckless disregard)(emphasis added). Summary judgment is granted on Count 4.

## III. CONCLUSION

For the reasons discussed above, the defendants' motion is GRANTED: on the First Cause of Action as to all claims against Herbert and Riccio, individually; on the age discrimination claim, national origin discrimination claim, and sex discrimination claim as to all defendants; on the Second Cause of Action, as to all claims against Herbert and

32

Riccio individually, and as to Grey's sex discrimination claim, age discrimination claim, and national origin discrimination claim as to all defendants; on the Third Cause of Action as to the sex discrimination claim and national origin discrimination claims against all defendants; and on the Fourth Count against all defendants. The remainder of the motion is DENIED. Claims remain against Riccio and Herbert for race discrimination in violation of the fourteenth amendment, pursuant to § 1983; and against the Board for constructive discharge and hostile work environment race discrimination in violation of Title VII and of the fourteenth amendment, pursuant to § 1983.

**SO ORDERED**

Dated at Bridgeport, Connecticut this 4th day of February, 2004.


Janet C. Hall
United States District Judge

33